**Opinion filed August 29, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00138-CR
_____

## DAVID RILEY CANADA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause No. 26560**

## M E M O R A N D U M   O P I N I O N

A jury convicted Appellant, David Riley Canada, of two counts of indecency with a child by contact, a second-degree felony. TEX. PENAL CODE ANN. § 21.11(a)(1), (d) (West 2019). Appellant pled "true" to a prior felony conviction for burglary of a habitation that was alleged in the indictment for enhancement purposes. PENAL § 12.42(b), § 30.02(a) (West Supp. 2024). The jury found the enhancement to be "true" and assessed Appellant's punishment at imprisonment for seventy-five years in the Institutional Division of the Texas Department of Criminal Justice on each count. The trial court sentenced Appellant accordingly.

In a single issue, Appellant contends that the trial court committed reversible error when it admitted a report (the CPS report) from the Department of Family Protective Services (the Department) that allegedly contained testimonial statements in violation of the Confrontation Clause. We affirm.

I. *Factual Background*

During a pretrial proceeding, B.G., a twenty-seven-year-old woman, testified that Appellant—a member of her brother's family—had sexually abused her when she was a child. B.G. did not recall Appellant sexually abusing her when she was five, but she testified that she did recall Appellant sexually abusing—touching, groping, and penetrating—her and her younger brothers multiple times when she was around seven or eight. After her testimony concluded, the State offered State's Exhibit No. 1, a certified copy of various court filings in a suit affecting the parent-child relationship that sought the protection and conservatorship of B.G. and her brothers, and the termination of the parental rights of the children's parents.

State's Exhibit No. 1 also included an affidavit by an agent of the Department—Kristy Barler—in which Barler stated that Appellant had sexually abused B.G. when she was five. Appellant objected to the admission of State's Exhibit No. 1 on the grounds that it violated his constitutional rights under the Confrontation Clause because Barler was not available to testify and could not be cross-examined. The trial court deferred ruling on Appellant's objection until after B.G.'s testimony had concluded, and, when it did, the trial court admitted the exhibit. The State then requested that B.G. be allowed to testify at trial about Appellant's sexual abuse. Appellant's trial counsel stated that he had no further objections on this point and that he would defer to the trial court's ruling. The trial court determined that the State would be permitted to present evidence to the jury regarding B.G.'s allegations of Appellant's sexual abuse.

At trial, the victim in this case, Jane Doe, testified that during a sleepover at a friend's house around September 2020, Appellant entered the bedroom where they were sleeping and touched her breasts and vagina over her clothes.[1] She was twelve at the time. She testified that on the day of this incident, she had skateboarded with her friend, J.G., consumed some of J.G.'s mother's Apple Crown Royal liquor, and returned to J.G.'s house to spend the night. After the girls went to sleep in J.G.'s bedroom, Doe heard a noise and saw Appellant enter the bedroom. She pretended to be asleep and watched as Appellant approached J.G. and brushed her hair from her face. Appellant thereafter approached Doe, moved her hair in the same manner, and fondled her breasts over her clothes. He then lifted her shirt and rubbed her vagina over her clothes. Doe pretended to be asleep while this occurred; Appellant eventually left the bedroom. Months later, Doe told her older brother what had occurred that day; he eventually told their parents, who contacted law enforcement.

Lieutenant Scot McDade of the Eastland Police Department testified that, after Doe's parents contacted him, he interviewed them and scheduled a forensic interview for Doe at the Eastland County Crisis Center. He testified that Doe said the incident had occurred approximately a year ago. He watched the forensic interview as it progressed via a television monitor and testified that Doe stated that she and J.G. had skateboarded and consumed half of a water-bottle's worth of Crown Royal that day, and then they went to J.G.'s house and fell asleep in J.G.'s bedroom. Doe slept alone in a bed, and sometime during the night Appellant entered the bedroom and touched Doe on her breasts and vagina over her clothes while she pretended to be asleep.

Lieutenant McDade also briefly spoke with Appellant after Doe's outcry was made. He testified that Appellant said he "didn't know it was another one of these,"

---

[1]We use initials and pseudonyms to protect the identity of the child victims involved in this appeal.

which Lieutenant McDade understood to mean that Appellant knew why Lieutenant McDade wanted to interview him, even though Lieutenant McDade had not informed Appellant of Doe's allegations. Lieutenant McDade believed this to be true because Appellant had previously been convicted of indecency with a child by contact, by touching J.G. on her breasts and vagina over her clothes. Evidently, Appellant's sexual contact with J.G. and Doe had occurred in the same home. Lieutenant McDade also testified that he had reviewed a report about a different case in which Appellant had sexually assaulted another female child, M.K.

The trial court admitted three orders of deferred adjudication community supervision pertaining to Appellant: two were for two counts of indecency with a child by contact involving J.G., and the other concerned sexual assault of a child, involving M.K. These documents showed that Appellant's sexual abuse of these victims occurred in 2020 after the incident involving Doe. Brack Dempsey with the 91st Judicial District Community Supervision and Corrections Department, Appellant's probation officer, testified that Appellant was currently on community supervision for those offenses.

Genesa Camacho, the forensic interviewer, testified about her forensic interview with Doe, and her testimony was substantially the same as Doe's outcry. Camacho testified that she was also aware of Appellant's criminal case involving J.G. at the time of Doe's forensic interview.

Rikki Flores, a licensed sex offender treatment counselor, counseled Appellant and testified that as part of his treatment, Appellant filled out a "sexual history questionnaire" that required that he identify all his sexual contacts and partners. Appellant listed several people, including two unnamed "[f]emale[s]," ages thirteen and sixteen; Appellant noted that he was thirty-four when he had sexual contact with these people. Appellant characterized his sexual contact with these young victims as "[f]ondle." Appellant answered another question in the

4

questionnaire which asked: "When is the last time you deliberately touched or brushed another in a sexual manner without their consent or knowledge?" He responded: "2020 female 13, 16." Another question asked: "What was your victim's name?" He wrote: "J, [G.]? 13 yr old 16 yr old [sic]." Still, another question asked: "How many times did you engage in sexual contact with the victim?" He wrote twice with the thirteen-year-old victim and once with the sixteen-year-old victim. Flores testified that sex offenders are not always completely honest when they complete the questionnaire and that it was possible Appellant did not identify other sexual abuse victims.

J.G. testified that Appellant sexually abused her by touching her at the same house where Doe was allegedly sexually abused by Appellant. J.G. testified that Doe spent the night at the house on the day of the alleged incident, but J.G. did not awaken during the night and did not witness the alleged abuse. J.G.'s mother testified that Appellant sexually abused J.G. by touching J.G. and that Doe had stayed at her house, where the alleged sexual abuse took place.

M.K. testified that she was sixteen in 2020 when Appellant invited her to go to the lake with him, where he sexually assaulted her by penetrating her vagina with his finger. She testified that Appellant pled guilty, was convicted of sexual assault of a child, and was granted community supervision.

B.G. testified that she has known Appellant since she was around three and that he is a member of her brother's family. She testified that Appellant touched her sexually when she was five. Although she could not recall much, she remembered that her parents were required to complete certain Department programs because Appellant had sexually abused her. She recalled subsequent acts of sexual abuse committed by Appellant that occurred in Weatherford and Cisco, when Appellant sexually assaulted and touched her and her younger brothers. Around this time, the

State offered, and the trial court admitted, State's Exhibit No. 1; Appellant's trial counsel did not object to the exhibit's admission.

B.G. confirmed that Barler's affidavit that was included in State's Exhibit No. 1 stated that Appellant had sexually abused her when she was five. She also testified that Appellant sexually abused her younger brother when he was five, and that several other male members of the family had sexually abused her. At no time during B.G.'s testimony did Appellant assert any objections.

Nicole Desmond, a records custodian for the Department, testified that she had provided the Department's records concerning B.G. to the Eastland County District Attorney's office. These records were offered and admitted, without objection, as State's Exhibit No. 22. Desmond testified that the records contained a "reason to believe" finding that Appellant had sexually abused B.G.

The State rested after Desmond's testimony concluded. The trial court then informed the jury that no further testimony would be presented before they took a mid-morning break. The trial court instructed the jury to "continue looking at those items that you have before you" and that it "know[s] that they're lengthy and you're passing them around the jury, so we'll just wait until you have completed that." While the jury reviewed the admitted exhibits, the trial court held a bench conference with trial counsel. After that, the trial court again addressed the jury and, noting that all the jurors had not reviewed each admitted exhibit, instructed them to leave the two remaining exhibits that had not been reviewed by them in their seats and called a fifteen-minute recess.

The jury returned to the courtroom after the break and continued reviewing the two remaining exhibits. The trial court stated: "And I really wish there was another way to do this, but this is the way it has to be done. So we will wait as you finish these documents." After an hour, the trial court called a lunch recess, even though the jurors had not finished reviewing the remaining exhibits. The trial court

instructed the jury not to discuss the case with anyone during the lunch recess and then stated: "I am going to visit with the attorneys and try to see what can be moved along more quickly. I know that if you're just sitting here, it can be a little bit slow. So we'll see if we can't do something to address that." After the lunch recess, the jury reconvened and the trial court stated: "By agreement in an effort to maybe keep these things from being too slow . . . you have been given photocopies. . . . So we will give you that opportunity to continue reviewing the exhibits."

After the jury finished reviewing the admitted exhibits, Appellant's trial counsel recalled J.G. Her testimony was brief and primarily focused on whether J.G.'s family friend or cousin, a girl named Katherine, was present on the day that J.G. alleged that Appellant had sexually abused her, and whether Katherine had slept in the bedroom with J.G. and Doe that night.

Next, Doe was recalled and her testimony, like J.G.'s, mostly focused on whether Katherine was present that evening, and for how long, and how much liquor Doe had consumed that evening. T.B., B.G.'s younger brother, then testified that Appellant never sexually abused him and claimed that B.G.'s allegations about Appellant were false.

Finally, Appellant testified. He denied sexually abusing B.G. and T.B. and described how, after he was investigated for those allegations, no charges were filed. He also testified that when he was charged for touching J.G. sexually and sexually assaulting M.K., he agreed to plead guilty to each offense as part of a plea bargain because he was facing a potential life sentence for each offense due to his prior felony conviction for burglary of a habitation. Appellant denied that he had ever touched any child inappropriately at any time, although he "accepted a probation plea" for two counts of indecency with a child by contact and one count for sexual assault of a child. After Appellant's testimony concluded, the jury reviewed the exhibits offered by Appellant.

The next day, trial counsel presented their closing arguments. The State's argument focused on Doe, her testimony, her outcry, and the forensic interview testimony, as well as the testimony of other witnesses that Doe confided in or who were involved in the incident. Once, the State briefly mentioned the testimony of "other victims" by name—J.G., M.K., and B.G. During his closing argument, Appellant's trial counsel pointed out that the jury could "totally discount" B.G.'s testimony because her brother, T.B., testified that her allegations were false. In its rebuttal argument, the State mentioned B.G. and T.B. to note that the purpose of the trial proceedings was not to determine if B.G. was sexually abused, but rather to determine if Doe was sexually abused. After deliberating, the jury found Appellant guilty on both counts.

During the punishment phase, the State briefly mentioned B.G. once more during its closing argument and said: "Brutality? I mean, it may not be someone getting beaten in the streets, but I bet you [J.G.] would disagree with that. I bet [M.K.] would disagree with that. I bet you [B.G.] would disagree with that. This is not vengeance. . . . This is justice for [Jane Doe]." After deliberating, the jury assessed Appellant's punishment at seventy-five years' imprisonment for each count. This appeal followed.

## II. *Standard of Review*

Generally, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). But when we review a Confrontation Clause objection, we review the trial court's evidentiary ruling de novo. *Woodall v. State*, 336 S.W.3d 634, 642 (Tex. Crim. App. 2011); *Wall*, 184 S.W.3d at 742–43.

## III. *Analysis*

In his sole issue, Appellant contends that the trial court committed reversible error when it admitted the CPS report that he claims contained testimonial statements in violation of his rights under the Confrontation Clause. The State contends that (1) Appellant failed to preserve this issue for appellate review, and (2) even if it was preserved, and although it concedes that the complained-of evidence was testimonial, its admission was harmless.

To preserve a complaint for appellate review, the complaining party must present a specific, timely objection or motion to the trial court, which states the specific grounds for the desired ruling. TEX. R. APP. P. 33.1(a)(1)(A); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021); *Burg v. State*, 592 S.W.3d 444, 448–49 (Tex. Crim. App. 2020) ("Rule 33.1 provides that a contemporaneous objection must be made to preserve error for appeal."); *see* TEX. R. EVID. 103(a). Further, to preserve a complaint, a party must either object each time the allegedly inadmissible evidence is offered at trial or request and obtain a running objection. *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)).

Although Appellant raised a Confrontation Clause objection to the admission of the CPS report during the pretrial hearing, Appellant asserted no objection when the same evidence was offered and admitted at trial. Moreover, Appellant did not obtain a running objection from the trial court or re-urge his Confrontation Clause objection when the State offered this evidence at trial. *See Valle*, 109 S.W.3d at 509. Therefore, Appellant did not preserve this complaint for our review. However, even if he had, and despite the State's concession that the complained-of evidence was testimonial, its admission was harmless.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend VI. The Confrontation Clause bars the

admission of out-of-court testimonial statements of a witness unless (1) the witness is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004); *Nicholls v. State*, 630 S.W.3d 443, 448 (Tex. App.—Eastland 2021, pet. ref'd). Furthermore, the procedural guarantees to confront and cross-examine adverse witnesses applies in both federal and state prosecutions. *Woodall*, 336 S.W.3d at 641; *Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010) (citing *Pointer v. Texas*, 380 U.S. 400, 406 (1965)).

"The principal concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Nicholls*, 630 S.W.3d at 448 (citing *Maryland v. Craig*, 497 U.S. 836, 845 (1990)). "To implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature." *Id.* (citing *Woodall*, 336 S.W.3d at 642). "An out-of-court statement may be testimonial when the surrounding circumstances objectively indicate that the primary reason the statement was made was to establish or prove past events that would be potentially relevant to a later criminal prosecution." *Id.* (citing *Davis v. Washington*, 547 U.S. 813, 822–23 (2006)); *see Crawford*, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). "'Testimonial' statements are typically formal, solemn declarations made for the purpose of establishing a fact." *Nicholls*, 630 S.W.3d at 449 (citing *Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005)).

When, as here, constitutional error is raised, the error requires reversal unless the reviewing court determines beyond a reasonable doubt that the error neither contributed to the defendant's conviction nor to the punishment assessed. TEX. R.

10

APP. P. 44.2(a); *Allison v. State*, 666 S.W.3d 750, 763 (Tex. Crim. App. 2023), *cert. denied*, 144 S. Ct. 245 (2023); *Sandoval v. State*, 665 S.W.3d 496, 515 (Tex. Crim. App. 2022). In short, constitutional error entails a rebuttable presumption of harm. *See Franklin v. State*, No. 02-23-00105-CR, 2024 WL 976800, at *1 (Tex. App.—Fort Worth Mar. 7, 2024, no pet.) (mem. op., not designated for publication) (citing *Casias v. State*, 36 S.W.3d 897, 900 (Tex. App.—Austin 2001, no pet.)).

When determining harm when a defendant's rights under the Confrontation Clause have been violated, relevant factors to consider are (1) the importance of the witness's testimony in the prosecution's case, (2) whether the testimony was cumulative of other evidence, (3) the presence or absence of evidence that either corroborates or contradicts the testimony of the witness on material points, and (4) the overall strength of the prosecution's case. *See Allison*, 666 S.W.3d at 763–64 (citing *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007)). The harm analysis under Rule 44.2(a) examines "whether it is likely that the constitutional error was actually a contributing factor" in the factfinder's deliberations—that is, whether the error "adversely affected the integrity of the process." *Id.* at 764. In addition to the factors listed above, in analyzing potential harm we may also consider the source and nature of the error, the extent, if any, the error was emphasized by the State, and how much weight the jury might have placed on the erroneously admitted evidence when compared to the other evidence that is relevant to an element of the charged offense or a defensive issue. *Id.* In the end, we must determine whether there is a reasonable possibility that the error moved the jury "from a state of non-persuasion to one of persuasion on a particular issue." *Id.*

Appellant contends that the State did not adduce overwhelming evidence of his guilt, but rather its case "hinged entirely on the credibility of [Doe]." Appellant asserts that the State "bolster[ed] its case" through extraneous evidence such as the CPS report that contained statements from witnesses that Appellant could not

11

confront—Barler. This, Appellant contends, bolstered the State's case by showing that Appellant acted in conformity with his past character. Moreover, Appellant reasons that the CPS report was not merely cumulative of B.G.'s testimony of the same past incidents of sexual abuse committed by Appellant because the CPS report elevated the argument from one of "he said, she said" by providing the State's "imprimatur" for "one side" that favored B.G.'s testimony.

Appellant also asserts that the CPS report played a significant part in the jury's deliberations. After the CPS report was published to the jury, the trial court permitted a break in the proceedings to provide the jury more time to read the lengthy report. After this break, the trial court noted that the jury needed more time to review the report and proceeded to break for lunch. Then, after the lunch break, the jury spent additional time examining the CPS report before the trial resumed. Appellant asserts that the time and scrutiny the jury devoted to the CPS report suggests that the report and its contents were significant to the jury's deliberations. We disagree.[2]

The State contends that the victim to whom the testimonial statements in the CPS report refers—B.G.—did testify at trial and was available for Appellant to cross-examine regarding her allegations that Appellant had sexually abused her. Thus, there could be no Confrontation Clause violation. Further, the statements in the CPS report regarding Appellant's sexual abuse were cumulative of B.G.'s trial testimony, and other evidence—namely, State's Exhibit No. 22, which was admitted without objection and which contained references to Appellant's sexual abuse of

---

[2]As an initial matter, although the State concedes that "the statement is likely testimonial," we previously have applied the rule that any error in the admission of improper evidence is cured when the same evidence is offered and admitted elsewhere during the trial without objection to appeals that involve Confrontation Clause violations. *See Ruiz v. State*, 631 S.W.3d 841, 864 (Tex. App.—Eastland 2021, pet. ref'd); *Nicholls*, 630 S.W.3d at 449 (citing *Valle*, 109 S.W.3d at 509). Thus, even if, as the State concedes, the admission of this evidence was error, it was cured by the unobjected-to admission of the same or substantially similar evidence in State's Exhibit No. 22. However, because the parties' briefing focuses on the alleged harm in the admission of this evidence, our analysis does the same.

B.G. in the same CPS case that was referenced in the CPS report. *See Allison*, 666 S.W.3d at 763–64.

Moreover, the evidence adduced by the State was compelling, irrespective of the admission of the CPS report and accompanying affidavit in State's Exhibit No. 1. The victim—Doe—testified that Appellant sexually abused her. Lieutenant McDade testified about arranging for and observing Doe's forensic interview with Camacho. Camacho testified about the substance of Doe's forensic interview. The State was allowed to present, and the jury was permitted to hear and consider, evidence concerning Appellant's three prior convictions for sexually assaultive offenses and other acts of sexual misconduct. This type of evidence is admissible in cases such as this. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2(b) (West Supp. 2024); *Wishert v. State*, 654 S.W.3d 317, 330 (Tex. App.—Eastland 2022, pet. ref'd) ("Article 38.37, Section 2(b) allows for the admission of evidence that the defendant has committed a separate offense of *a sexual nature against a child*; the child victim . . . need not be the victim of the offense for which the defendant is currently on trial.") (internal quotation marks omitted).

J.G. testified that Appellant sexually abused her by touching her at the same house where Doe alleged Appellant had also sexually abused her. M.K. testified that, when she was sixteen in 2020, Appellant invited her to go to the lake with him, where he sexually assaulted her by penetrating her vagina with his finger. B.G. testified that Appellant sexually assaulted her and her younger brothers when they were young children. And, State's Exhibit No. 22, which contained the same or very similar evidence as that in State's Exhibit No. 1, was admitted without objection.

Appellant contends that State's Exhibit No. 1 was important to the State's case because of the substantial amount of time that the jury was allowed to review the admitted trial exhibits. We disagree. State's Exhibit No. 1 consists of forty-four pages and State's Exhibit No. 22 consists of forty pages. The trial court's statements

regarding the jury's need to review these exhibits suggest that, for most of the time, only one copy of each exhibit was available for the jury to review, and this contributed greatly to the time that was required for each juror to review the exhibits. These pauses in the trial proceedings do not suggest an inordinate importance for State's Exhibit No. 1.

Further, the State did not unduly emphasize the complained-of CPS report. Although the State briefly mentioned B.G.'s sexual assault in its closing argument on one occasion, its closing argument focused primarily on the sexual abuse that Appellant had committed against Doe.

We conclude that, even if it was error to admit State's Exhibit No. 1, and we do not so conclude, any such error did not contribute to Appellant's convictions or his punishments beyond a reasonable doubt. TEX. R. APP. P. 44.2(a); *Allison*, 666 S.W.3d at 763. In short, it did not "adversely affect[] the integrity of the process." *See Allison*, 666 S.W.3d at 764. Accordingly, we overrule Appellant's sole issue.

## IV. *This Court's Ruling*

We affirm the judgments of the trial court.

W. STACY TROTTER

JUSTICE

August 29, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

14